IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.   13-cv-2826-WYD-CBS

ELHAM SALEMI,

      Plaintiff,

v.

COLORADO PUBLIC EMPLOYEES' REITRIEMENT ASSOCIATION;
TIM MOORE, in his official and individual capacities;
ANGELA SETTER, in her official and individual capacities,

      Defendants.

---

**ORDER**

---

I.   <u>INTRODUCTION AND BACKGROUND</u>

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment (ECF No. 56), filed on June 10, 2015.  The matter is fully briefed.

Plaintiff was an employee of Defendant Colorado Public Employees' Retirement Association ("PERA") from May of 2004, beginning as an intern, through May 10, 2012, when her employment was terminated.  At all times relevant to Plaintiff's Complaint, Defendants Tim Moore ("Moore") and Angela Setter ("Setter") were employed by PERA.  Moore was the Director of the Alternative Investments Department, and Setter was the Director of Human Resources.

Plaintiff alleges that during her eight-year employment with PERA, Defendants discriminated against her on the basis of her gender, her race, and her national origin.  Plaintiff is Persian-American woman who was born in Iran.  She claims that because of this unequal treatment, she was denied timely promotions, retaliated against for

complaining about unequal treatment, and denied equal pay and work opportunities that were offered to her white male co-workers.  She claims that following her FMLA leave and the filing of a charge with the Equal Employment Opportunity Commission ("EEOC"), she was abruptly fired.    Plaintiff asserts seven causes of action against Defendants:  1) discrimination and failure to promote under Title VII of the Civil Rights Act; 2) retaliation under Title VII; 3) race and national origin discrimination under 42 U.S.C. § 1983; 4) retaliation under § 1983; 5) retaliation under the First Amendment; 6) retaliation under the Family Medical Leave Act ("FMLA"); and 7) wage discrimination under the Equal Pay Act.  Plaintiff seeks declaratory and injunctive relief, economic damages, non-economic damages, punitive damages, interest, attorney's fees and costs.  Defendants argue that all of Plaintiff's claims fail as a matter of law, and that they are entitled to summary judgment on all claims.

II.    STANDARD OF REVIEW

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Employment Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A material fact is one that might affect the outcome

2

of the dispute under the applicable law.  *Ulissey v. Shvartsman,* 61 F.3d 805, 808 (10th Cir. 1995).  I must construe all inferences in favor of the party against whom the motion under consideration is made.  *Pirkheim v. First Unum Life Ins. Co.,* 229 F.3d 1008, 1010 (10th Cir. 2000).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

III.   <u>DISCUSSION</u>

The following facts are undisputed.  Plaintiff, an at-will employee, began working for PERA's Alternative Investments ("AI") department as an intern on May 17, 2004. She was promoted to Portfolio Associate within the AI department on September 1, 2004.  Moore became the AI Director in February of 2007, at which time he became Plaintiff's supervisor.  Plaintiff was promoted to the position of Analyst within the AI department on June 2, 2008.  Plaintiff alleges that this promotion was over a year late, and should have been awarded sooner.  Plaintiff was being paid an annual salary within the 2007 range.  Since she should have been paid within the 2008 range, her salary was later adjusted and she was paid the difference retroactively.

Plaintiff's colleagues within the AI department were Aaron Norton ("Norton"), Dan Chilton ("Chilton"), John Kasic ("Kasic"), and Dave Saunders ("Saunders"), all males. The only individual on the team who held the same job title as Plaintiff during her employment with PERA was Saunders, who was hired as an Analyst on January 1, 2010.  The other individuals (Norton, Chilton, and Kasic) worked as Portfolio Managers during Plaintiff's employment with PERA.    All four of Plaintiff's colleagues were qualified for the jobs they held at PERA.

During Plaintiff's eight year employment with PERA, she received annual performance evaluations.  Although Plaintiff consistently received overall positive reviews for her work, she also received consistent feedback suggesting that she improve her assertiveness skills, take more initiative in meetings, and be more vocal and confident in her role within the department.

In March of 2011, Plaintiff expressed interest in the Portfolio Manager track. Moore expressed concern that she had not demonstrated the required qualities of a Portfolio Manager.  In May of 2011, Setter suggested that Plaintiff take communications classes to improve some of her skills.

After feeling that her concerns had not been properly addressed and that she was being treated differently than the white men in her department, Plaintiff submitted a written complaint to Setter on June 28, 2011.  Plaintiff expressed frustration with the fact that she had been labeled as a quiet person and that this was preventing her from moving forward in her career with PERA.  PERA conducted an internal investigation in response to Plaintiff's complaint.  Eight individuals were interviewed and all of them confirmed Plaintiff's quiet nature and reluctance to speak up at meetings.  PERA's conclusion of the investigation was that Plaintiff's claims of being treated differently were not substantiated.  Plaintiff received notice of the investigation's findings in a letter dated September 1, 2011.

Prior to the conclusion of the investigation, Plaintiff left work to begin FMLA leave on July 18, 2011.  She remained on leave for five months, first on FMLA leave, then on short term disability leave.  During her leave, she filed a Charge of Discrimination with

the EEOC on September 29, 2011, alleging discriminatory treatment.  She returned to work on December 19, 2011.

During her leave, Plaintiff looked for a new job.  Within a few weeks of her return to PERA, Plaintiff began working for Metro State University as a teacher; however, she also continued working for PERA.  Moore and Plaintiff met several times after her return regarding the nature of the tasks she was asked to complete, her performance of those tasks, and the quality of her work.  On May 9, 2012, Moore recommended that Plaintiff's employment be terminated based on poor job performance.  Plaintiff was terminated on May 10, 2012.

## A.      Title VII Claims – Against Defendant PERA

### 1. *Administrative Remedies*

As a preliminary matter, Defendants argue that some of Plaintiff's Title VII claims are outside the Court's jurisdiction because she failed to exhaust administrative remedies on those claims.  Plaintiff filed one EEOC charge on September 29, 2011.  Defendant argues that Plaintiff's claims under Title VII are limited to acts that occurred during the 300 days leading up to the EEOC charge – December 3, 2010 through September 29, 2011 – and that her Title VII claims, either before or after this time frame, were not administratively exhausted.  Plaintiff does not dispute that she filed only one charge on September 29, 2011.  However, Plaintiff argues that the Court already ruled in her favor on this issue when it denied Defendants' motion to dismiss on September 30, 2014.

The issue of subject matter jurisdiction can be challenged at any time in the proceedings.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)

("The requirement that [subject matter] jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception."); *see also Franklin Sav. Corp. v. United States,* 180 F.3d 1124 (10th Cir. 1999); *Huffman v. Saul Holdings Ltd.*, 194 F.3d 1072, 1076-77 (10th Cir. 1999) ("A defect in subject matter jurisdiction can never be waived and may be raised at any time."). This Court's previous Order denying Defendants' motion to dismiss did not rule on the issue of jurisdiction, but instead only found that Plaintiff had stated a claim that was plausible on its face. Therefore, the issue of jurisdiction over Plaintiff's claims remains an issue for the Court to decide.

Federal courts lack jurisdiction over Title VII claims that were not previously covered in a claim presented to the EEOC. *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1226 (10th Cir. 2014). A plaintiff is barred from suing on incidents that occurred more than 300 days prior to a filed EEOC charge. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ("Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the . . . 300–day time period after the discrete discriminatory act occurred."). Further, discrete acts such as termination, wage violations, failure to promote, or discrimination are "easy to identify" and each act constitutes a separate actionable practice. *Nat'l R.R.*, 536 U.S. at 114. Therefore, acts that occur more than 300 days before or at any time after the filing of an EEOC charge are not actionable under the previously filed charge, and a new charge must be filed within 300 days after the new discrete act.

Plaintiff cites *Goodwin v. General Motors*, 275 F.3d 1005 (10th Cir. 2002) for the proposition that her claims of incidents that occurred more than 300 days prior to her

EEOC charge are not time barred because evidence of discrimination outside the 300

day period is still admissible and probative of whether her compensation or job status

was affected by discriminatory actions.  *See* Pl.'s Response, ECF No. 69, p. 50.  Prior

to the Supreme Court's decision in *National Railroad*, Plaintiff's theory was embraced by

many jurisdictions.  However, *National Railroad* limited the applicability of the continuing

violations theory and held that Title VII "precludes recovery for discrete acts of

discrimination or retaliation that occur outside the statutory time period."  *Nat'l R.R.*, 536

U.S. at 105.  Additionally, "discrete discriminatory acts are not actionable if time barred,

even when they are related to acts alleged in timely filed charges."  *Id.* at 113.   Thus,

Plaintiff's Title VII claims regarding incidents that occurred prior to December 3, 2010

will not be considered here.

Regarding Plaintiff's claims after the filing of the EEOC charge, the Tenth Circuit

held that "each act of retaliation must be separately exhausted, even when acts that

post-date the EEOC complaint reasonably relate to others presented to the EEOC."

*Eisenhour*, 744 F.3d at 1227, citing *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003).

Therefore, "federal courts lack jurisdiction over incidents occurring after the filing of an

EEOC claim unless the plaintiff files a new EEOC claim or otherwise amends her

original EEOC claim to add the new incidents."  *Id.*  Plaintiff argues that her claims

based on incidents after the filing of the EEOC charge are viable because the EEOC

and PERA were both on notice of a pattern of discriminatory or retaliatory conduct when

she filed her charge in September of 2011.  *See* Pl.'s Response, ECF No. 69, p. 52-53.

Plaintiff offers no case law in support of her argument, but instead asks the Court to

"extend, modify, or reverse the law" as determined by the Tenth Circuit in *Martinez*, or

"to establish new law applicable to these circumstances." *Id.* at 53, n.7.  The Court declines to do so, and finds that because Plaintiff did not file any other EEOC charge, nor did she amend the first EEOC charge to include new incidents, the Court lacks jurisdiction on all of her Title VII claims involving incidents that occurred after September 29, 2011, the date her EEOC charge was filed.

   2. *Failure to Promote*

   Plaintiff alleges two separate Title VII claims for failure to promote.  First, she claims that her promotion in June of 2008 from Portfolio Associate to Analyst was delayed by over a year.  Second, she claims that PERA refused to promote her to Portfolio Manager after she requested to be put on track for that promotion in March of 2011.  As noted above, for Plaintiff's Title VII claims, the Court only has jurisdiction over incidents that allegedly occurred between December 3, 2010 and September 29, 2011.  Accordingly, only her second claim of failure to promote will be considered here.

   For a Title VII failure to promote claim, Plaintiff must establish that 1) she was a member of a protected class; 2) she applied for and was qualified for the position; 3) despite being qualified she was rejected; and 4) after she was rejected, the position was filled.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003), citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  If Plaintiff can establish a prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for its employment action.  *Jones*, 349 F.3d at 1266; *see also Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1216 (10th Cir. 2002).

   Plaintiff alleges that in March of 2011, she asked Moore about her future with PERA and the possibility of being considered for a promotion to Portfolio Manager.  Am.

Compl., ¶ 34; Def.'s Motion for Sum. Jud., p. 18, ¶ 56.  At that time, Moore stated that "this did not seem to be her forte" because she had not demonstrated the required qualities of a Portfolio Manager.  Def.'s Motion for Sum. Jud., p. 18, ¶ 56.  Defendants argue that the Portfolio Manager position "required assertiveness, ability to ask difficult questions, and ability to negotiate and recommend investment activity," and that Plaintiff "failed to exhibit those qualities."  Def.'s Motion for Sum. Jud., ECF No. 56, p. 36. Defendant notes that Plaintiff acknowledged in her December 2010 and January 2012 performance reviews that "I still need to acquire more knowledge in order to convey my thoughts and ideas effectively in meetings."  *Id.*

Plaintiff asserts that Moore told her that rather than promoting her to Portfolio Manager, "he would create a new title called 'System *something*.'"  Am. Compl., ¶ 34. Although she offers no supporting evidence, Plaintiff claims that the new position would be a "dramatic demotion" for her.  *Id.*  Plaintiff claims that Moore's comments about Portfolio Manager not being her forte were "based, in part, on Mr. Moore's stereotypes of Ms. Salemi's gender, race, national origin, and culture."  *Id.* at ¶ 35.  Plaintiff claims that her quiet nature and closed body language was a sign of respect and could be attributed in part to her Iranian culture.  *See* Pl.'s Response, ECF No. 69, Ex. 1, p. 31:9-19.  Plaintiff claims that in response to her request to be promoted, she instead was met with assignments of "miniscule administrative duties" which "adversely affected her ability to perform her Analyst duties."  *Id.* at ¶¶ 36, 41.

Plaintiff cannot satisfy the elements for a Title VII failure to promote claim. Although she is a member of a protected class (based on gender and on race), she cannot demonstrate that she was qualified for the position that she expressed interest in

having, nor can she demonstrate that the position was filled after she was rejected. Saunders was promoted from Analyst to Portfolio Manager in January of 2012; however, even if Plaintiff could demonstrate that the promotion of Saunders met the final element of a failure to promote claim, his promotion occurred more than three months after the filing of her EEOC charge.  Her failure to promote claim would not have even been ripe until January of 2012 when Saunders allegedly filled the position that Plaintiff had expressed interest in pursuing.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's Title VII failure to promote claim.

   *3.  Discrimination*

   For Plaintiff's Title VII discrimination claim, Plaintiff must demonstrate that 1) she was a member of a protected class; 2) she suffered an adverse employment action; and 3) the action arose in circumstances giving rise to an inference of discrimination.  *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).  Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Mickelson v. New York Life Ins. Co.,* 460 F.3d 1304, 1311 (10th Cir. 2006).  If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual. *Id.*

   The Tenth Circuit liberally defines the phrase "adverse employment action."  *See Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir. 1998); *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir. 1998); *Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998).  Courts take "a case-by-case approach," examining the unique factors relevant to the situation at hand.  *Jeffries,* 147 F.3d at 1232.  However,

an adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities." *Sanchez*, 164 F.3d at 532, citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998) (conduct is an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

Plaintiff's only alleged conduct that could rise to the level of an adverse employment action within the applicable 300 day time period is that of a failure to promote her to the position of Portfolio Manager.  Otherwise, during that 300 day period, Plaintiff does not allege "a significant change in employment status" that would support a Title VII discrimination claim.

Plaintiff alleges that comments about her quiet nature were made with discriminatory intent because of her gender and her race.  Def.'s Motion for Sum. Jud., ECF No. 56, Ex.3, 31:9-19.  Plaintiff also states that in June of 2011, when Plaintiff filed her written complaint with Setter, Setter asked Plaintiff "what women in Ms. Salemi's position do in Iran."  Am. Compl., ¶¶ 45-46.

The Tenth Circuit has held that "[u]nsubstantiated oral reprimands and unnecessary derogatory comments . . . are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status." *Sanchez*, 164 F.3d at 533 (finding that isolated comments about the plaintiff's age did not rise to the level of a materially adverse employment action).  Further, Plaintiff stated during depositions that being quiet in nature was not specific to either

gender or race.  *See* Def.'s Motion for Sum. Jud., ECF No. 56, Ex.3, 75:3-25, 76:1-9.

Plaintiff has not demonstrated that she suffered any adverse employment action within

the 300 day time period due to any discriminatory intent by PERA.  Accordingly,

Defendants are entitled to summary judgment on Plaintiff's Title VII discrimination claim.

   *4.  Retaliation*

   In order to demonstrate a Title VII retaliation claim without direct evidence of

retaliatory intent, Plaintiff must establish a prima facie case of discrimination.  If Plaintiff

succeeds in proving a prima facie case, Defendants must provide a legitimate and

facially non-discriminatory reason for its decision.  *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973).  If Defendants satisfy this burden, Plaintiff must establish that

Defendants' reasons were a pretext for discrimination.  *Id.* at 804.  The elements of a

Title VII retaliation claim are 1) plaintiff engaged in protected opposition to

discrimination; 2) a reasonable employee would have found the challenged action

materially adverse; and 3) a causal connection existed between the protected activity

and the adverse action.  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir.

2008).

   Within the applicable 300 day period, the opposition that Plaintiff engaged in was

her verbal complaint to Setter on May 18, 2011, and her written complaint to Setter on

June 28, 2011.  *See Somoza*, 513 F.3d at 1213 (informal complaints of discrimination to

one's superiors may also constitute protected activity).  On May 18, 2011, Plaintiff told

Setter she was "frustrated with her career development" and "felt she was being treated

differently than the rest of the male employees in her division."  Def.'s Motion for Sum.

Jud., ECF No. 56, Ex. 22.  She indicated to Setter that she wanted "opportunities to

develop her communication skills and knowledge to advance to a Portfolio Manager,"
and acknowledged that to be successful in that position a person needed "excellent
communication skills and more knowledge than she currently had." *Id.* She indicated a
willingness to pursue communication classes. *Id.* Plaintiff also discussed how her
upbringing "influenced her behavior such as: as a sign of respect one waited to be
asked questions or acknowledged but that she was very capable of articulating her
ideas and thoughts." *Id.* Plaintiff indicated to Setter that "[s]he liked the group of people
she worked with and she wanted to stay at PERA." *Id.*

On June 28, 2011, Plaintiff emailed a written complaint to Setter.  In that
complaint, Plaintiff stated that "I would like to progress within the company to Portfolio
Manager, but [Moore] is again holding me back and telling me that he does not see me
as a Portfolio Manager."  Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 24, p. 2.  She
stated that "I have been treated differently than the other analysts who all are men," that
she had not been "functioning at my job descriptions," and that "I am given the
responsibilities that no one else wants."  She noted that in March of 2011, she was told
that she was not "confrontational; therefore it is not my forte to move on the [Portfolio
Manager] track."  Plaintiff noted that Moore had indicated to her that she was "closed
because I fold my arms across my chest," and that "[i]n my culture, crossed arms are a
sign of respect.  I find it unfair that I have been judged by my body language."  Finally,
Plaintiff noted:

> I have enjoyed working with my colleagues and I have no wish to be
> moved to a different team.  I'd like to reiterate that I have worked diligently
> in the past seven years and I have been a value add [sic] member of the
> AI team.  While my quiet nature is being held against me, it should not
> prevent me from moving forward in my career.  The "quiet employee" is
> oftentimes the most knowledgeable and competent employees [sic] . . . I

look forward to your assurance that a formal plan would be formulated to enable me to develop and grow professionally.

*Id.* at 2-3.

For a retaliation claim, the Court must look at the employer's conduct after the point that the employee engages in opposition to discrimination. Here, that time period started on May 18, 2011. In response to Plaintiff's verbal complaint, Setter recommended that Plaintiff take advantage of communications classes. Setter and Moore met with Plaintiff on June 1, 2011 to go over her concerns about having more substantive work in alignment with her job description. On June 8, 2011, Plaintiff replied to an email inquiry from Setter:

Plaintiff: I want to thank you so much for taking the time to talk to Tim and I regarding my [performance review] plan again. I will sign up for a couple of communication classes soon.

Setter: I enjoy working with you and Tim and look forward to your feedback on the classes. . . . Let me know how things are going or if I can help you in any way.

Plaintiff: I really appreciate all your help and support! I got a conference brochure regarding The Colorado Conference for Women. It is . . . designed for professional women and how they should improve their communication skills at work. The agenda looks great and I just want to run it by you.

Setter: Sounds like a good class. Go for it!

*See* Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 23, p. 1, 2.

In response to Plaintiff's written complaint on June 28, 2011, PERA initiated an internal investigation, and the results of the investigation were communicated to Plaintiff in a letter dated September 1, 2011. In that letter, signed by PERA's Chief Operating Officer, PERA stated "[w]e have concluded our investigation and have determined that your complaint is unsubstantiated."   Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 25.

Prior to the conclusion of that investigation, however, Plaintiff began a five-month period of leave, starting on July 18, 2011, thirteen business days after she filed her written complaint.  Then on September 29, 2011, Plaintiff filed her EEOC charge, effectuating the ending date for any Title VII claims that she may have asserted.

Plaintiff has not met her burden to establish the second element of a retaliation claim.  She has provided no evidence that between May 18, 2011 and September 29, 2011, PERA engaged in any kind of adverse action against her because of her complaints regarding discriminatory treatment based on her gender and her race.  Because there was no adverse action during the 300 day period, Plaintiff's Title VII claim of retaliation cannot stand.

Based on the above reasoning, Defendant is entitled to summary judgment on all of Plaintiff's Title VII claims.

**B.      § 1983 Claims – against Defendants Moore and Setter**

   *1. Race and National Origin Discrimination under 42 U.S.C. § 1981*

Plaintiff claims that she was discriminated against based on her race in violation of § 1981, which led to her termination.  *See* Am. Compl., ¶¶ 86, 88.  Section 1981 prohibits racial discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(a), (b).  To establish a claim of such discrimination, Plaintiff must demonstrate that Defendants Moore and Setter "intentionally or purposefully discriminated against her."  *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1532 (10th Cir. 1995), citing *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).  Plaintiff has not alleged sufficient evidence to

support a claim of intentional discrimination against her based on her race or national origin.  Moore's comments about her closed body language during meetings and her quiet nature in the context of discussions over the appropriateness of the Portfolio Manager position for her do not rise to the level of intentional discrimination, even though Plaintiff asserts that these comments were made as a reference to her race, national origin, and culture.  Am. Compl., ¶ 35.  Plaintiff acknowledged in her deposition that a quiet nature could be attributed to any race or national origin.  *See* Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 3, 75:3-25, 76:1-9.  Plaintiff also indicated that Moore was simply providing feedback on Plaintiff's appearance of disinterest during meetings, and that as her supervisor, he was "entitled" to judge her job performance and that it was his "role" to do so.  *Id.* at 68.

Additionally, Setter's question about what women in Iran would do in Plaintiff's situation does not support a claim of intentional discrimination.  Defendants argue that this comment "was benign," that Plaintiff only "assumes that Ms. Setter implied something negative," and that Plaintiff "openly talked about being Persian and being from Iran with Ms. Setter."  Def.'s Reply, ECF No. 82, p. 80.  Plaintiff alleges in her complaint that this comment suggested to her that "Ms. Setter did not think Ms. Salemi was entitled to move up within the company due to her gender, national origin, and race."  Am. Compl., ¶ 45.  Setter's single comment, which is better characterized as a "stray remark," does not rise to the level of intentional discrimination.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (holding that "stray remarks, unrelated to the challenged action, are insufficient to create a jury issue.").

Since Plaintiff cannot establish a claim for intentional discrimination, and relies instead on circumstantial evidence to prove that she was terminated as a result of racial or national origin discrimination, the *McDonnell Douglas* burden shifting framework must be applied.   To carry the burden of establishing a prima facie case of race discrimination for a wrongful termination claim, Plaintiff must show that 1) she belongs to a protected class; 2) she was qualified and satisfactorily performing her job; and 3) she was terminated under circumstances giving rise to an inference of discrimination. *Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912 (10th Cir. 2004).   Plaintiff has presented evidence sufficient to meet the first two elements:  she is a member of a protected class, and she was qualified for and was satisfactorily performing the job of Analyst.  She regularly received positive performance evaluations, although she also received consistent feedback within those evaluations stating that she needed to improve her assertiveness and communication skills.  However, viewed in the light most favorable to Plaintiff, the record indicates that at least until the end of 2011, she was performing her job in an overall satisfactory manner.   However, the circumstances of Plaintiff's termination in May of 2012 do not give rise to an inference of any racial or national origin discrimination.  Apart from Plaintiff's allegations about Moore's comments about her body language and quiet nature in March of 2011, and Setter's isolated question about what women in Iran do in May of 2011, there is no connection between these allegations and Plaintiff's termination in May of 2012.  Instead, the record indicates a conflict of a personal nature with Moore as Plaintiff's supervisor.  Accordingly, Plaintiff has not met her burden to establish a prima facie case of racial or

national origin discrimination, and Defendants Moore and Setter are entitled to summary judgment on her § 1981 discrimination claim.

2. *Retaliation under 42 U.S.C. § 1981*

Plaintiff claims that Defendants subjected her to adverse actions in retaliation for her verbal and written complaints.  The elements of a § 1981 retaliation claim are the same as those for a Title VII claim:  Plaintiff must establish that 1) she engaged in protected opposition to discrimination; 2) an adverse action was taken against her; and 3) a causal connection existed between the protected activity and the adverse action.  *See Hull v. Colo. Bd. of Governors of Colo. State Univ. Sys.*, 805 F. Supp. 2d 1094, 1109 (D. Colo. 2011).

As discussed above, Plaintiff could not substantiate her Title VII claim that between May 18, 2011 and September 29, 2011, Defendants engaged in any kind of adverse action against her because of her complaints regarding discriminatory treatment based on her race or national origin.  Additionally, the record showed that Defendants worked with her to address her concerns about the progress of her career at PERA, offered solutions to those concerns, and promptly investigated claims of unequal treatment.  For her § 1981 retaliation claim, however, the Court may consider alleged adverse actions by Defendants any time after she engaged in the protected activity.

Defendants claim that Plaintiff cannot meet the first element of a claim for retaliation because "she never complained of race discrimination in the time frame leading up to her EEOC charge."  Def.'s Reply, ECF No. 82, p. 81.  This argument has no merit.  Regardless of the strength of the evidence of actual discriminatory treatment,

on May 18, 2011, Plaintiff did in fact complain to Setter about comments about her body language, and mentioned that her upbringing had influenced her behavior.  Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 22; *see also Somoza*, 513 F.3d at 1213 (informal complaints of discrimination to one's superiors may also constitute protected activity). Plaintiff also noted in her written complaint to Setter on June 28, 2011 that Moore had commented on her tendency to fold her arms across her chest, noting that "[i]n my culture, crossed arms are a sign of respect.  I find it unfair that I have been judged by my body language."  Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 24, p. 3. Accordingly, Plaintiff has met her burden in establishing the first element of her retaliation claim.

As for the second element, that there was an adverse action taken against her in response to her protected opposition, Plaintiff states that Defendants subjected her "to efforts to adversely affect the terms and conditions of her employment, terminating her, and other discriminatory practices."  Am. Compl., ¶ 95.  Conduct is considered an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington,* 524 U.S. 742, 761 (1998), citing *Crady*, 993 F.2d at 136 ("[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994) (a "bruised ego" is not sufficient to show an adverse employment action); *Kocsis v.*

*Multi-Care Mgm't, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (a demotion without a change in pay, benefits, duties, or prestige is not an adverse action); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to a more inconvenient job is insufficient).  The only adverse action that Plaintiff asserts that meets the definition of such an action, then, is that she was terminated in May of 2012.  This is sufficient to meet the burden of establishing the second element of a retaliation claim.

For the third element, a plaintiff must establish "a causal connection between her protected conduct and the adverse employment action by proffering 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct *closely followed* by adverse action.'"  *Unal v. Los Alamos Pub. Schs.*, 2016 WL 360758, at *11 (10th Cir. Jan. 29, 2016) (emphasis added), citing *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005).  "Although evidence of 'very close[ ]' temporal proximity will provide compelling evidence of retaliation, and, in some cases, may be sufficient on its own, *Piercy v. Maketa,* 480 F.3d 1192, 1198 (10th Cir. 2007), a plaintiff must also show that the person who engaged in the adverse employment action was aware of the protected activity."  *Unal*, 2016 WL 360758, at*11, citing *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (per curiam) (noting that some cases "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case.").  Here, Plaintiff was terminated on May 10, 2012, more than ten months after she engaged in protected activity (verbal complaint in May of 2011, written complaint in June of 2011).  *See* Pl.'s Response, ECF No. 69, p. 70.  A period of ten months between a protected activity and an adverse action is insufficient to establish

the third element of causal connection in a retaliation claim.  *See MacKenzie*, 414 F.3d

1266, 1279 (finding that a period of nine months between plaintiff's filed grievance and a

failure to promote did not meet the burden of establishing a causal connection for

retaliation).  Therefore, Plaintiff has failed to establish the third element, and Defendants

are entitled to summary judgment on her § 1981 retaliation claim.

     3.  *First Amendment Retaliation*

     Plaintiff claims that the complaints in her EEOC charge were protected activities

of speech and petition under the First Amendment, and "were not solely related to only

her own rights, but rather raised issues of significant public concern and rights affecting

other employees, potential employees, taxpayers, and the general public."  Am. Compl.,

¶¶ 103-04.  She further states that she had an "interest in commenting on and opposing

systemic gender discrimination by her employer against herself and others similarly

situated, and on a class-wide basis," and that she was subjected to "disparate treatment

because of her gender, race, and national origin."  *Id.* at ¶¶ 106, 107.

     When a public employee makes a First Amendment claim, "the district court must

balance the First Amendment interests of that employee, speaking as a concerned

citizen, with the government's interests in 'promoting the efficiency of the public services

it performs through its employees.'"  *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1227

(10th Cir. 2014), citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S.

563, 568 (1968).  To conduct this analysis, a court looks at: 1) whether the speech was

made pursuant to an employee's official duties; 2) whether the speech was on a matter

of public concern; 3) whether the government's interests, as employer, in promoting the

efficiency of the public service are sufficient to outweigh the plaintiff's free speech

interests; 4) whether the protected speech was a motivating factor in the adverse employment action; and 5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *Id.* at 1227-28, citing *Dixon v. Kirkpatrick,* 553 F.3d 1294, 1301–02 (10th Cir. 2009).

In deciding whether the statements are constitutionally protected, a court must determine whether they relate to a matter of public concern (which is protected) or a matter of purely personal interest (which is not protected). *Id.*, citing *Wulf v. City of Wichita,* 883 F.2d 842, 856–57 (10th Cir. 1989).  The court considers the speaker's motivation: was the speech calculated to redress personal grievances or did it have some broader public purpose?  *Id.*, citing *Starrett v. Wadley,* 876 F.2d 808, 816 (10th Cir. 1989).  Speech involves a public concern when the speaker intends to "bring to light actual or potential wrongdoing or breach of public trust" by a public official or to "disclose[ ] any evidence of corruption, impropriety, or other malfeasance" within a governmental entity. *Id.*, citing *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir. 1988) (citations omitted).  In evaluating whether speech concerns the public, the court considers "the content, form, and context of a given statement, as revealed by the whole record." *Id.*, citing *Connick v. Myers,* 461 U.S. 138, 147–48 (1983).

Courts in other jurisdictions have found that allegations of racial or national origin discrimination can be a matter of public concern, but not when the speech concerns only matters of personal interest. *See Sousa v. Roque*, 578 F.3d 164 (2d Cir. 2009) (holding that "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern. An employee who complains solely about his own dissatisfaction with the conditions of

his own employment is speaking upon matters only of personal interest."); *Ayoub v. Texas A&M Univ.*, 927 F.2d 834 (5th Cir. 1991) (finding that employee's statements were not expressed in a manner that would call the public's attention to the alleged wrong); *Short v. City of West Point*, 1997 WL 88225, at *6 (N.D. Miss. Jan. 23, 1997) (holding that the employee had not "spoken out as a citizen generally concerned about racial discrimination" but instead spoke "only as [an] employee distressed with how his employer's allegedly racially discriminatory practices [had] affected him alone.").

Here, Plaintiff claims that she was subjected to gender, racial and/or national origin discrimination and that she complained about such discrimination.  In her internal complaints and in her EEOC charge, she noted that she believed that she was discriminated against based on her race or national origin, citing comments about her body language and quiet nature.  Plaintiff claims that because of her complaints, she was retaliated against in violation of her First Amendment rights.  Despite Plaintiff's claims that her First Amendment rights were violated based on racial or national origin discrimination, the record indicates that her statements (that crossing her arms was a sign of respect in her culture, and that she was being unfairly judged for her body language based on her race) were made to address a very specific and personal grievance.  There is no indication in the record, nor is there any allegation by Plaintiff, that there was any practice or pattern of racial or national origin discrimination at PERA.

Next, Plaintiff argues that her complaints about gender discrimination led to retaliation in violation of her First Amendment rights.  Here, she claims that the statements she made "affected her but . . . affected others as well."  Pl.'s Response, ECF No. 69, p. 75.  She asserts that her *all* of her complaints concerned discrimination

she personally faced, but also included specific instances of gender discrimination against other women in the office.  However, the record does not bear that out.  There is no indication in the record that Plaintiff referred to any company-wide practice of gender discrimination that affected other women in the company in her meeting with Setter on May 18, 2011.  The record only indicates that she expressed personal frustration with being treated differently from the men in her department.  Similarly, in her written complaint submitted on June 28, 2011, Plaintiff only refers to alleged discriminatory treatment that she was subjected to, and mentions nothing about systematic practices or patterns of discrimination affecting other women in the company.  She speaks only of her own frustrations, her own experiences, and her own future opportunities with PERA. There is no indication in any of her internal complaints that anyone else in the company had similar gender-based grievances.  In her EEOC charge, she asserted alleged conduct "on behalf of myself and others similarly situated, and on a class-wide basis"; an alleged comment from Setter that the AI department was a "male dominated area"; and an alleged incident involving a female administrative assistant at PERA who complained about having to do secretarial tasks for male employees.  *See* Am. Compl., Ex. 1, p. 1.  But the record indicates that the same female employee later clarified that her comment had to do with workload discrepancies and not gender.[1]  Accordingly, I

---

[1] *See* Def.'s Response, ECF No. 81, p. 46, Statement by Armstrong:  "At one point in 2011, I felt I was handling more work for one AI team member than the rest.  I told Mr. Moore I did not like this, and he responded that we all have things come up from time to time in our personal lives.  At the next weekly meeting, Mr. Moore told all the AI employees to "mind our own business."  [Moore] and I spoke after the meeting and resolved it; I had come to agree with him about everyone having things come up that we know nothing about and should not make assumptions.  This interaction and his comment at the meeting had nothing to do with gender, race, or Ms. Salemi.  It was a general comment to not watch the clock on each other.  In other words, my impression from Mr. Moore's comments [was] to not clock watch, mind to one's own business, and not make assumptions about other people."

find that Plaintiff's statements are personal in nature, because they focus solely on her own grievances.

The analysis does not end there, however.  Even speech that focuses on internal employment conditions and is made in the context of a personal dispute may still be regarded as pertaining to a matter of public concern if it addresses important constitutional rights which society at large has an interest in protecting.  *Woodward v. City of Worland*, 977 F.2d 1392, 1404 (10th Cir. 1992).   Plaintiff cites to cases in other jurisdictions indicating that gender discrimination is a matter of public concern.  *See e.g.*, *Campbell v. Galloway*, 483 F.3d 258 (4th Cir. 2007); *Wyckoff v. Maryland*, 522 F. Supp. 2d 730 (D. Md. 2007).   Although there is no similar plain language holding in the Tenth Circuit, there exists some precedent agreeing that gender discrimination is a matter of public concern, but that it is not *always* a matter of public concern.  *Huff v. Colo. Dep't of Corrections*, 2012 WL 3135715, at *5 (D. Colo. July 31, 2012). Therefore, Plaintiff's statements must be examined for "content, form, and context . . . as revealed by the whole record."  *Connick,* 461 U.S. at 147–48.   A court must "consider the motive" that Plaintiff had at the time she made her statements "to learn if the speech was calculated to redress personal grievances . . . or a broader public purpose."  *David v. City and Cnty. of Denver*, 101 F.3d 1344, 1355 (10th Cir. 1996).

Here, Plaintiff's allegations of company-wide gender discrimination only first appeared in her EEOC charge, and consisted of only a single reference to an inquiry made by another female employee who later clarified that her inquiry was not based on any concern about gender discrimination.  *See Connick*, 461 U.S. at 148 (a personal employment dispute is not converted into a matter of public concern merely because an

employee seeks to show that other employees may have similar complaints).  No such allegations were made in her internal complaints that would support an inference of retaliatory conduct in response to those allegations.  For example, in her complaint to Setter on May 18, 2011, Plaintiff indicated that "she was frustrated with her career development" and felt "she was being treated differently than the rest of the male employees in her division."  Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 22.  She did not indicate any concern over gender discrimination against other women in the office, nor did she refer to any specific instances of such conduct.  Instead she focused on her own frustration with her career, her desire to improve her skills, her disagreement with her previous performance review, and her desire to continue working at PERA.  *Id.*

Similarly, in her written complaint of June 28, 2011, and the email accompanying it, Plaintiff focused on how the alleged mistreatment affected her only.  She stated to Setter "I know you said today that my situation is just about dealing with a difficult boss. But I strongly believe that I have been treated differently."  *Id.* at Ex. 24, p. 1.  She expressed frustration with being assigned administrative duties and that somebody had to do them, noting "[t]hat somebody is me not the male analyst."  *Id.*  Plaintiff noted that "I would like to progress within the company . . . but [Moore] is again holding me back." *Id.* at 2.  She points Setter to specific issues that she had "struggled with," including that "I have been treated differently than the other analysts, who are all men," and that "I have not been allowed to develop like the male analysts."  *Id.*  She expressed frustration over requesting but not receiving opportunities and mentorship that she wanted, and discontentment with her salary, noting "I think I was the only one in this situation."  *Id.* at 3.  She noted that "I feel like I have been taking a step backward when others have

been moving up." *Id.*  Finally, she noted that her "requests about the inadequate attention to my situation have yielded no results." *Id.*

Clearly, Plaintiff focused solely on her own situation and personal grievances in these internal complaints.  The thrust of her statements is that she was personally being subjected to gender discrimination.  Read in context with the entire record, Plaintiff's statements expressed concern only about her own situation, and it is clear that she was attempting to address personal grievances that she had with Moore and Setter. *See Starrett v. Wadley*, 876 F. 2d 808, 816 (10th Cir. 1989); *Huff*, 2012 WL 3135715, at *5 (finding that plaintiff's speech addressing gender discrimination in the workplace did not constitute matters of public concern because they related to "purely personal grievances affecting her own conditions of employment."); *see also Connick*, 461 U.S. at 149 ("[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case.  While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."); *Garcetti v. Ceballos,* 547 U.S. 410 (2006) (stating that while the First Amendment protects employees' speech in certain circumstances, it does not permit employees to "constitutionalize the employee grievance.").

There is no substantiated allegation in the record that a practice or pattern of discrimination existed at PERA at a level that would support Plaintiff's First Amendment claim.  The grievances expressed by Plaintiff were private matters, with no relevance to

public interests.  Accordingly, these grievances do not involve a matter of public

concern, and her First Amendment retaliation claim fails as a matter of law.

*4.  § 1983 Claims against Moore and Setter in their Official Capacities*

PERA is a statutory pension plan available to most State of Colorado employees,

and is an instrumentality of the State of Colorado.  Accordingly, Defendants Moore and

Setter are considered state officials.  Prevailing law indicates that Moore and Setter

cannot be sued in their *official* capacities for damages under § 1983.  *See* Def.'s Motion

for Sum. Jud., ECF No. 56, p. 65, citing *Hull v. State of New Mexico Taxation and*

*Revenue*, 179 Fed. Appx. 445 (10th Cir. 2006); *Stidham v. Peace Officer Standards and*

*Training*, 265 F.3d 1144 (10th Cir. 2001); *see also Buchwald v. Univ. of New Mexico*,

159 F.3d 487 (10th Cir. 1998).  In Plaintiff's response to the summary judgment motion,

she abandons her pursuit of money damages on this portion of this claim, and limits her

assertion of Moore and Setter's official liability to a claim for equitable injunctive relief

only.  *See* Pl.'s Response, ECF No. 69, p. 87-88.

Plaintiff argues that injunctive relief in the form of reinstatement of her

employment constitutes sufficient grounds to bring suit against Moore and Setter in their

official capacities under § 1983.  *Id*., citing *Meiners v. Univ. of Kansas*, 359 F.3d 1222

(10th Cir. 2004) (noting that "[r]einstatement of employment is a form of prospective

equitable relief that is within the doctrine of [the *Ex parte Young* exception to the

Eleventh Amendment's sovereign immunity bar].").  In order to establish that the

equitable relief of an injunction in the form of reinstatement is applicable in this case,

Plaintiff needs to establish that she was discriminated against in violation of her

constitutional rights.  *See Meiners*, 359 F.3d at 1232-33 (noting that although

reinstatement is a form of equitable relief in § 1983 claims, the plaintiff needed to prevail

on her procedural due process claim, and show that she possessed a protected

property interest in her continued employment).  If she can establish the elements of her

claims of discrimination or retaliation in the workplace under § 1983, then the question

of equitable relief can go forward against Moore and Setter in their official capacities.

Since Plaintiff cannot establish the required elements as discussed above, Defendants

Moore and Setter are entitled to summary judgment on those claims in their official

capacities.

## C.    FMLA Claim – Against All Defendants

Plaintiff claims that after returning from her FMLA leave in December of 2011,

"Defendants took actions that a reasonable employee would have found materially

adverse, including but not limited to a detrimental decrease in Ms. Salemi's substantive

job duties and responsibilities, failure to promote, and termination."  Am. Compl., ¶ 112.

She asserts this claim against all Defendants.

In order to establish a prima facie case of FMLA retaliation, a plaintiff must show

that 1) she engaged in a protected activity; 2) she subsequently suffered adverse action

by the employer; and 3) a causal connection existed between the employee's activity

and the adverse action.  *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir.

1997); *Archuleta v. Colo. Dep't of Insts.*, 936 F.2d 483, 486 (10th Cir. 1991).  The FMLA

defines "employer" as "any person who acts, directly or indirectly, in the interest of the

employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).

*1. Defendants Moore and Setter*

Defendants argue this claim cannot survive against Defendants Moore and Setter because "this Court does not impose FMLA liability on individuals." The Tenth Circuit has yet to decide whether individual liability can be imposed under the FMLA, but courts in other jurisdictions have found individuals liable under the FMLA. *See e.g.*, *Mitchell v. Chapman,* 343 F.3d 811, 827 (6th Cir. 2003) (stating that the FMLA extends liability to private-sector employees); *Darby v. Bratch,* 287 F.3d 673, 680–81 (8th Cir. 2002) (comparing the FMLA and FLSA definitions of "employer," and determining that each statute imposes individual liability); *Wascura v. Carver,* 169 F.3d 683, 685–86 (11th Cir. 1999) (stating that the FMLA provides for individual liability, as it defines "employer" more broadly than Title VII, the ADEA and the ADA).

Additionally, courts within the Tenth Circuit have found individual liability under the FMLA. *See e.g.*, *Pinkard v. Lozano,* 2007 WL 4116019, at *2 (D. Colo. Nov. 16, 2007) (finding individual liability because the FMLA and FLSA rely on similar definitions of employer); *Saavedra v. Lowe's Home Centers, Inc.*, 748 F. Supp. 2d 1273, 1284 (D.N.M. 2010) (finding that the FMLA provides for individual liability); *Pedersen v. W. Petrol. Inc.,* 2008 WL 977370, at *3 (D. Utah Apr. 8, 2008) (joining with courts that have found individual liability under the FMLA); *Williamson v. Deluxe Fin. Servs.,* 2005 WL 1593603, at *9 (D. Kan. July 6, 2005) (acknowledging the existence of personal liability under the FMLA).

In order "to establish an individual's liability within the meaning of 'employer,' the individual must have supervisory authority over the complaining employee, or control in some way the plaintiff's ability to take a leave of absence and return to work." *Pinkard*,

2007 WL 4116019, at *2, citing *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir.

1987).  FMLA regulations provide that this definition of employer applies to "individuals

as such 'corporate officers acting in the interest of an employer.'"  29 C.F.R. §

825.104(d); *Saavedra*, 748 F. Supp. 2d at 1283 (noting that "individuals such as

corporate officers 'acting in the interest of an employer' are individually liable for any

violations of the requirements of FMLA."); *Stuart v. Regis Corp.*, 2006 WL 1889970, at

*6 (D. Utah July 10, 2006) (finding that a supervisory employee without corporate

responsibilities beyond her role of supervisor was not liable individually under the

FMLA); *Mondaine v. Am. Drug Stores, Inc.,* 408 F. Supp. 2d 1169, 1186 (D. Kan. 2006)

(holding that individuals who have no corporate role beyond a managerial position are

not employers under the FMLA); *see also Williamson*, 2005 WL 1593603, at *9 (finding

that a supervisor and an HR manager did not have sufficient responsibility or stature

within the company to warrant imposition of personal liability under the FMLA); *Brunelle*

*v. Cytec Plastics, Inc.*, 225 F. Supp. 2d 67, 81 (D. Me. 2002) (finding that a front-line

supervisor who was personally responsible for decisions that contributed to a denial of

FMLA leave was not sufficiently prominent in the employer's operations to be an

"employer" under the FMLA); *Keene v. Rinaldi*, 127 F. Supp. 2d 770, 777, n.3 (D.N.C.

2000) (holding that "neither the FLSA or the FMLA were intended to impose liability on

mere supervisory employees as opposed to owners, officers, etc.")

    Here, Defendant Moore has held the title of AI Director since February 12, 2007.

Defendant Setter was the Benefits Department Senior Trainer starting on January 2,

2008, and then held the title of Director of Human Resources starting on March 16,

2011.  Only Moore ever supervised Plaintiff.  Accordingly, Setter cannot be held

individually liable for any FMLA retaliation claims that Plaintiff asserts.  As to Moore, the

company organizational chart indicates that he headed up the AI department under the

supervision of Chief Investment Officer, Jennifer Paquette ("Paquette").  Other

departments under Paquette include Equities, Fixed Income, Real Estate, and

Investment Operations, among others.  *See* Def.'s Motion for Sum. Jud., ECF No. 56,

Ex. 8.  Other officers at the same level as Paquette include the Chief Technology

Officer, the Chief Benefits Officer, and the Chief Financial Officer.  Above these officers

are the Chief Executive Officer/Executive Director (to whom Paquette reported), and the

Chief Operating Officer/General Counsel.  These officers, in turn, report to the Board of

Trustees.  *Id.*   Plaintiff noted in her Complaint that when she discussed a promotion to

Analyst with Moore in 2007, he indicated that she needed to talk to Paquette.  Am.

Compl., ¶ 16.  Similarly, when Plaintiff initially expressed her concerns about Moore to

Paquette, Paquette addressed those concerns with Moore in his year-end performance

review, then later met with Plaintiff and Moore together and encouraged them to work

on their communication.  *Id.* at ¶ 19.  The record clearly indicates that Moore supervised

Plaintiff.  However, Plaintiff has provided no evidence, and there is no support for the

idea, that Moore had any corporate responsibilities beyond his supervisory role over his

department.  Therefore, he cannot be held individually liable for any FMLA retaliation

claims that Plaintiff asserts.  Accordingly, only Plaintiff's FMLA retaliation claim as it

pertains to PERA will be addressed.

### 2. *Defendant PERA*

A retaliation claim can be brought "when the employee successfully took FMLA

leave, was restored to her prior employment status, and was adversely affected by an

employment action based on incidents post-dating her return to work." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282 (10th Cir. 2007). Plaintiff engaged in protected activity under the FMLA when she took leave from her job starting on July 18, 2011. She claims that she suffered adverse actions by PERA upon her return in December of 2011, including a failure to promote, a change in job responsibilities, and termination on May 10, 2012, in retaliation for the five month leave period that she took. Although Defendants state that Plaintiff's claimed adverse actions do not meet the burden of the second element, actions such as failure to promote and termination are clearly adverse.

The only element left to consider is whether Plaintiff can establish that a causal connection existed between Plaintiff's leave and the alleged adverse actions that she suffered upon returning to work. The Tenth Circuit has stated that the temporal proximity between the protected activity and the retaliatory conduct is relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (finding that a period of six weeks from the time that the employer knew of the employee's intent to invoke her FMLA rights and her return to work was sufficiently close in time); *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (noting that a one and a half month time period between the protected activity and the adverse action may be enough to establish causation, but that a period of three months, without additional evidence, is insufficient to establish causation). An employee can rely on temporal proximity alone only if the adverse action is "*very closely* connected in time to the protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (finding that a three month period was insufficient to establish causation).

The Tenth Circuit has also indicated that the temporal proximity clock begins at the time that the employer knew of the employee's plan to take FMLA leave. *See Metzler*, 464 F.3d at 1171.  Here, that date was July 18, 2011.  *See* Def.'s Motion for Sum. Jud., ECF No. 56, p. 23, ¶ 77.  Plaintiff notes that "[a]bout five months passed between . . . alerting Defendants that she would take FMLA leave, and returning from leave."  Pl.'s Response, ECF No. 69, p. 80.  A period of five months is not sufficiently close in time to establish a causal connection to the adverse action.  Therefore, the Court considers any additional evidence offered by Plaintiff to show a causal connection.

Plaintiff states that her "her duties and responsibilities worsened upon her return because she had taken FMLA leave."  Am. Compl., ¶ 57.  However, she also stated the following in her deposition testimony: "[s]o I had all my responsibilities that I had before FMLA.  In addition to all that, Mr. Moore also asked me to create a database for their secondary project."  Pl.'s Response, ECF No. 69, Ex. 1, 287: 21-24.  She also states that she was given the task of backup for the AI cash flow for an assistant who was out of the office on vacation for one week.  These allegations are insufficient to support a finding of a causal connection to her FMLA leave.

Plaintiff claims that she was also subjected to a failure to promote after returning from her FMLA leave.  However, she offers no additional evidence regarding PERA's failure to promote her to the position of Portfolio Manager that differs from the evidence she offered pertaining to the same claim prior to her FMLA leave.  Accordingly, the fact that Saunders was promoted to Portfolio Manager on January 16, 2012 cannot be said to be a retaliatory action taken against Plaintiff for having initiated her FMLA leave more than five months prior.

Finally, Plaintiff argues that she was terminated in retaliation for her FMLA leave. She offers no facts that would support the inference that her termination was caused by her FMLA leave.  Since her termination occurred nearly ten months after she began her leave period, and there is no indication in the record that she was terminated because of her leave, Plaintiff has failed to establish a causal connection between her FMLA leave her termination.

Accordingly, Plaintiff has failed to establish a prima facie case of FMLA retaliation against PERA, and Defendants are entitled to summary judgment as a matter of law.

## D.    Equal Pay Act Claim – Against All Defendants

Plaintiff asserts a wage discrimination claim against all Defendants under the Equal Pay Act ("EPA") at 29 U.S.C. § 206(d)(1).  This statute imposes "a form of strict liability on employers who pay males more than females for performing the same work – in other words, the plaintiff in an EPA case need not prove that the employer acted with discriminatory intent." *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310-11 (10th Cir. 2006).  For an EPA claim, the plaintiff must show that employees of the opposite sex were paid differently for performing substantially equal work.  If she meets this burden, the burden then shifts to the defendant to show that the wage disparity was justified by one of four affirmative defenses, including 1) a seniority system; 2) a merit system; 3) a pay system based on quantity or quality of output; or 4) a disparity based on any factor other than sex.  *Id.* at 1311.

### 1.  Defendants Moore and Setter

Defendants argue that Moore and Setter cannot be held individually liable under the EPA.  This Court has not previously ruled on this question.  Judge Blackburn in

*Nasious v. Nu-Way Real Estate* noted that other courts have reached divergent conclusions on whether individual liability is available under the EPA, but he declined to rule on the issue in that case.  2008 WL 280745, at *1, n.1 (D. Colo. Jan. 31, 2008). Similarly, no Tenth Circuit case has ruled on this issue.

Defendant points to decisions from other courts, which suggest that the EPA should be likened to Title VII, and therefore, individual liability cannot be imposed.  *See e.g.*, *Peters v. Black Tie Value Parking Serv., Inc.*, 2013 WL 149773, at *3 (W.D. Okla. Jan. 14, 2013) (holding that the Equal Pay Act "imposes liability only upon an employer, and individual supervisors and managers are not liable for a violation of the Act."); *Converse v. City of Oklahoma City*, 649 F. Supp. 2d 1310, 1320 (W.D. Okla. 2009) (holding that "no [EPA] claim can be made against the individual defendants because, as with Title VII of the Civil Rights Act of 1964, individual supervisors cannot be held personally liable."); *Harris v. City of Harvey*, 992 F. Supp. 1012, 1013-14 (N.D. Ill. 1998) (noting that "the Equal Pay Act, in essence, is a blood sibling of, and conceptually interfaces with, the employment discrimination statutes (namely, Title VII . . . ), rather than of the Fair Labor Standards Act which it was physically added to.")

However, the Southern District of Illinois disagreed with the *Harris* holding and its reliance on Title VII provisions in *Holliday v. WSIE 88.7 FM Radio Station*, 2005 WL 3312633, at *5-6 (S.D. Ill. Dec. 7, 2005).  In *Holliday*, the court stated that it was "not convinced that [EPA] claims may only be asserted against an employer and not a supervisor."  *Id.* at *5.  It found the court's reasoning in Harris "unpersuasive" in its description of the EPA as a "blood sibling" of the EPA.  The court noted that, although the Seventh Circuit found the definition of "employer" as used in Title VII or ADA

actions, "that Court did not have similar difficulties determining the strictures of the term as employed in the EPA." *Id.*, citing *Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995); *EEOC v. AIC Security Investigations, Inc.*, 55 F.3d 1276 (7th Cir. 1995); *see also Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (noting that the FLSA definition of employer "is defined broadly enough . . . to permit naming another employee rather than the employer as defendant, provided the defendant had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation."). The FLSA defines "employer" to include "any person" acting "directly or indirectly in the interest of an employer." 29 U.S.C. §§ 203(d).

The definition of "employer" under the FLSA, rather than that under Title VII, must be applied to claims under the EPA, which is an amendment of the FLSA, and under that definition, a supervising employee *may* be held individually liable for an EPA violation. However, as noted by the courts in both *Holliday* and *Riordan*, an employee should assert an EPA claim against *either* the employer *or* the individual supervisor(s), but not both. The phrase "*rather* than the employer" in the *Riordan* decision implies that "although a plaintiff might permissibly assert an EPA claim against another employee, a plaintiff should not assert an EPA claim against *both* an employer *and* another employee." *Holliday*, 2005 WL 3312633, at *6. The EPA claim should not proceed against both PERA and Defendants Moore and Setter for this reason. Therefore, the claim is dismissed as against Defendants Moore and Setter.

### 2. Defendant PERA

Defendants argue that Plaintiff cannot meet her burden of a prima facie case against PERA because they claim that she did not perform substantially the same work

as any of her co-workers.  Plaintiff held the position of Analyst from June of 2008 to May of 2012.  During that time, Norton held the title of Senior Portfolio Manager; Chilton was a Portfolio Manager; Kasic was a Portfolio Manager; and Saunders was an Analyst from January 2010, and then a Portfolio Manager starting in January 2012.  Plaintiff's Analyst salary, which started at $68,759 (after being adjusted from $67,008 due to an internal error), was lower than that of all of her male colleagues in the AI department between June of 2008 and May of 2012.[2]  Plaintiff states that her Analyst salary was "still in the low end of the salary range for the analyst position."  Pl.'s Response, ECF No. 69, p. 5. She claims she was the "lowest paid professional in the AI department" and that "[t]he only other investment professionals in the AI department besides Ms. Salemi were male."  *Id.* at 6.

Although the positions of Analyst and Portfolio Manager have different titles, there appears to be some overlap in the kind and quality of essential job functions listed on the respective job descriptions.  Both positions appear to engage in analyzing, screening, and evaluating potential investments; both engage in reviewing and monitoring financial reports; and both make recommendations for potential investments, based on research and analysis.  One difference in the job functions appears to be that the Portfolio Manager is responsible for managing the existing investments that the team collectively pursued.  However, the Tenth Circuit has held that job differences that are "not significant in amount or degree will not support a wage differential."  *Riser v. QEP Energy*, 776 F.3d 1191, 1198 (10th Cir. 2015), citing *Brennan v. S. Davis Comm. Hosp.,* 538 F.2d 859, 862 (10th Cir. 1976).  Job descriptions or titles alone do not

---

[2] Plaintiff's salary started at $68,759 in June of 2008 and ended at $92,660 in May of 2012; her male colleagues earned between $90,000 and $129,000 in June of 2008, and between $120,000 and $155,301 in May of 2012.

determine whether jobs are substantially equal.  The "[a]pplication of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job." *E.E.O.C. v. Cent. Kan. Med. Ctr.*, 705 F.2d 1270, 1272-73 (10th Cir. 1983) *overruled on other grounds*, citing *EEOC v. Universal Underwriters Ins. Co.,* 653 F.2d 1243, 1245 (8th Cir.1981).  Here, "a reasonable jury could find the skill, effort, and responsibility required to perform [one] job was 'substantially equal' to that required to perform [the other]." *Id.*

Defendants attempt to argue that the jobs are not substantially similar by Plaintiff's own admission.  They point to statements made by Plaintiff in her depositions, including the following exchanges:

Q: With those four [Chilton, Kasic, Norton, and Saunders], did you have the same responsibilities as them?

A: I did not.

. . .

Q: You believe that your work that you were given as an analyst at PERA was not substantially equal to the male comparators?

A: That's correct, yes.

. . .

Q: Were these men doing different work than you were doing?

A: They were.

*See* Def.'s Motion for Sum. Jud., ECF No. 56, Ex. 3, 61:9-12; 63:7-11; 65:8-10.

However, the parties have demonstrated a material difference in their interpretations of the term "substantially equal work," and Defendants' reliance on these

statements by Plaintiff to support their argument is misplaced.  Plaintiff contends instead

that she was not given the same opportunities for growth and development as an

Analyst.  In the statements offered by Defendants above, in an attempt to show that the

jobs themselves were not substantially similar, Plaintiff, in fact, was attempting to

articulate the inequity of opportunities that she perceived during her employment at

PERA.  She was not stating that the jobs were different; she was stating that she was

not given the same number of opportunities, within the context of the expected

opportunities for the Analyst position, that males in her department were given.  The

three statements that Defendant offered above were part of a larger topic of discussion

during Plaintiff's deposition in which she stated the following:

> As an analyst, you are supposed to have the opportunity to spend more
> time or to get more involved in investment activity, and that was not
> granted.  I was supposed to assist with due diligence.  I was supposed to
> get involved in . . . legal negotiations, closing the investment opportunity. .
> . . I was supposed to be given opportunities similar to that, and that was
> not given to me. . . . I did not have the opportunities to get involved in
> investment activities . . . closing a deal from beginning to the end.  I did
> not have the opportunity to attend four or five day due diligence trips very
> similar to my male colleagues.  A male colleague who had functioned as
> an analyst or as a portfolio manager had three to four due diligence trips,
> on average, every year.  While I was . . . at PERA, I only had two due
> diligences that I assisted.

> *Id.* at 58:25 – 59:1-24.

During the deposition, Defendants' counsel seemed to understand that Plaintiff

was stating that she believed she had been denied the same responsibilities and

opportunities given to her male colleagues because she asked:  "[s]o you believe that

you were not provided substantially equal work?"; "[l]et me get an exhaustive list from

you . . . of the individuals who were male or you believe were given better opportunities than you while you were an analyst."; "[s]o was [Moore] providing better opportunities . . . to these males?" *Id.* at 61:4-5; 62:15-19; 65:19-22. Defendants cannot now claim that these statements, taken out of context, demonstrate that Plaintiff's job itself was not substantially similar to those of her male colleagues.

The question remains, then, whether the two positions – Analyst and Portfolio Manager – are substantially similar. The Tenth Circuit has stated that "[w]hat constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined, but must take into consideration the broad remedial purpose of the law." *Riser*, 776 F.3d at 1196 (citations omitted). "That said, we have consistently held that jobs that are merely alike or comparable are not 'substantially equal' for purposes of the EPA." *Id.* Accordingly, genuine disputes of material fact exist as to whether Plaintiff's work was "substantially equal" to her male colleague's work in the AI department, and summary judgment in favor of Defendants is precluded.

IV. CONCLUSION

For the reasons set forth herein, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (ECF No. 56) is **GRANTED** in part, and **DENIED** in part. It is granted as to Plaintiff's first, second, third, fourth, fifth, and sixth claims for relief against all Defendants. It is also granted as to Plaintiff's seventh claim for relief as against Defendants Moore and Setter. It is denied as to Plaintiff's seventh claim for relief as against Defendant PERA.

Dated:  March 31, 2016

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge